Filed 12/30/24  P. v. Farca CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROSS FARCA,<br><br>        Defendant and Appellant. | A165339<br><br>(Contra Costa County Super. Ct. No. 05002015113) |

Ross Farca appeals after a jury convicted him of (1) manufacturing an assault weapon (Pen. Code[1], § 30600, subd. (a)); (2) possessing an assault weapon (§ 30605, subd. (a)); (3) interfering with another person's exercise of civil rights by threat of force (§ 422.6, subd. (a)); (4) criminal threats (§ 422, subd. (a)); and (5) threatening a public officer (§ 71).  He contends (1) sections 30600 and 30605 are unconstitutional because they infringe on rights protected by the Second Amendment; (2) substantial evidence does not support his conviction for violating section 422.6, subdivision (a); (3) the jury was not instructed on an element of the section 71 offense of threatening

---

[1] Undesignated statutory citations are to the Penal Code.

1

a public officer, and (4) substantial evidence does not support his convictions for criminal threats or threatening a public officer. We conclude Farca forfeited his first argument by failing to raise it in the trial court, and we do not agree with his fourth argument. But we agree with Farca that the evidence does not support his conviction for violating section 422.6, subdivision (a) and the instruction on the charge of threatening a public officer under section 71 prejudicially omitted an element of the offense. We therefore affirm the convictions on the first, second, and fourth counts; reverse the convictions on the third and fifth counts; and remand the matter to the trial court for further proceedings.

## BACKGROUND

Around June 2019, Farca had two accounts on Steam, an online gaming website and social platform. Steam allows users to post comments on one another's pages, like a social networking site. The name of one of Farca's accounts was "Adolf Hitler (((6 MILLION)))." The description of the account said "Brenton Tarrant is a hero!!" and had an icon of the flag of New Zealand. Brenton Tarrant shot and killed about 50 Muslim people at mosques in Christchurch, New Zealand. The description of the Steam account also stated, "I have a fully semi automatic assault weapon AR15 with multiple high capacity magazines. Wanna see a mass shooting with a body count of over 30 subhumans?" The Nazi party in World War II referred to Jews as subhumans.

Using that account, Farca sent a message to three other users, saying, "I currently own an AR15 semi auto rifle but I can

buy/make the auto sear and get the M16 parts kit. What do you think of me doing what John Earnest tried to do, but with a Nazi uniform, an unregistered and illegally converted 'machine gun' and actually livestreaming it with Nazi music? I would get a body count of like 30 kikes and then like 5 police officers because I would also decide to fight to the death 1) you don't surrender to the ZOG 2) ever watch US prison documentaries? Also I would not spam full auto, I would just use it for clusterf,ucks [*sic*] of kikes. Generally you want to be on semi auto only so you don't waste ammo plus depending on the target richness and need for suppression eventually I may go low on ammo so I would need to resupply from the dead officers since it's 5.56." Farca also posted, "I just would need a better target than f,ucking [*sic*] some random synagogue with kikes that aren't really a threat. Preferibly [*sic*] with some high value targets, even though they would have their own security." John Earnest shot and killed one person at a synagogue in Poway in early 2019. (U.S. Attorney's Off., S.D. Cal., (Press Release, Dec 28, 2021) John T. Earnest Sentenced to Life Plus 30 Years in Prison for Federal Hate Crimes Related to 2019 Poway Synagogue Shooting and Attempted Mosque Arson, <https://www.justice.gov/usao-sdca/pr/john-t-earnest-sentenced-life-plus-30-years-prison-federal-hate-crimes-related-2019> [as of Dec. 30, 2024].) "Kike" is a derogatory term for a Jewish person.

Acting on a tip from the FBI, Detective Gregory Mahan of the Concord police found Farca's Steam posts. The FBI tip identified the Steam user as Farca. Mahan conducted a background check and discovered that Farca lived in Concord and

had purchased a "stripped lower" for an AR-15 a few months earlier. A stripped lower is the most basic part of a firearm on which a gun is built by adding other components.

Farca lived in his mother's home with his grandmother and brother. In Farca's bedroom, police found, among other things, an AR-15-style semiautomatic rifle with a pistol grip, detachable magazine, telescoping stock, and two types of scopes. The rifle had been assembled from the stripped lower that Farca had purchased and additional components that Farca received in the mail. Police also found 10 30-round and three 40-round magazines that corresponded to the rifle and tools and instructions for assembling firearms. Mahan opined at trial as an expert that the rifle was an assault weapon as defined by section 30515 because of its removable magazine, pistol grip, and telescoping stock. (§ 30515, subd. (a)(1)(A) & (C).) But Mahan also said that the weapon had a legitimate self-defense purpose.

Also in Farca's home were a Japanese sword, a military-style combat fixed-blade knife, and a military-style camouflage uniform. Farca had numerous history books about World War II and Nazi Germany, as well as two pro-Jewish books. Laptops and a cell phone in Farca's room had a large amount of anti-Semitic and pro-Nazi material, including a copy of Mein Kampf, as well as a video of the Christchurch shooting. The laptops were linked to the Steam accounts. The Internet history on Farca's laptops and phone included searches for "Concord police scanner," "First Lutheran Church in Concord," "sf jewish library," and "sf jewish museum." The devices had saved copies of Steam chats

4

and Youtube comments in which Farca's account mentioned suicide by cop, being willing to slaughter law enforcement officers, and not being willing to go to prison.

Deborah K., the executive director of a synagogue in Lafayette, learned through a media article and law enforcement bulletin that Farca had been arrested less than 10 miles from the synagogue and had said online that he wanted to attack Jewish people and kill police. She also learned that the police seized an assault weapon during the search. Deborah K. felt concerned or threatened because of her knowledge of the attacks earlier that year by Tarrant and Earnest and the fact that Farca was arrested nearby with the means to carry out an attack. She contacted the local police, and the synagogue hired armed, full-time private security. Deborah K. knew that Farca had not posted anything directly identifying her synagogue or its rabbi or congregants.

Mahan testified at Farca's preliminary hearing on October 5 and 20, 2020. On October 8, 2020, Mahan was involved in an advisory role in a federal probation search of Farca's home. Mahan participated in the briefing before the search, stood down the block during the search, and came to Farca's home after the scene was secure in order to answer any questions the federal officers might have. During the search, Farca was sitting on a curb across the street, guarded by a deputy sheriff and a federal probation officer. When Mahan was no longer needed and was walking away from Farca's home, he heard Farca yell, "Private Mahan, why are you here? This is a federal search. Sieg Heil.

5

Sieg Heil." Farca continued yelling, but Mahan tried to ignore it, got in his car, and left. Later, Mahan learned that the deputy sheriff guarding Farca had heard him say, "Mahan, the next time I see you, you will be arresting me for PC187 on you." Penal Code section 187 defines the crime of murder. The sheriff told Farca to calm down and stop yelling. Farca complied, apologized, and explained that he hated Mahan because Mahan had ruined his life. Farca then laid down flat on the ground.

When Mahan heard about Farca's statement from the sheriff's deputy, Mahan interpreted it as a threat to kill him. Mahan was concerned by Farca's threat because Farca made the threat publicly and called him "Private," indicating Farca viewed him as a solider and therefore an acceptable target. Mahan was also concerned because he was in the middle of testifying at the preliminary hearing and knew what Farca had posted online about being willing to die by provoking a law enforcement response. Mahan feared an assault in front of the courthouse. Mahan later learned that a few days after the threat Farca had removed his federal probation ankle monitoring bracelet. Mahan took various steps to increase his security, including implementing security measures at his house and changing his routes to and from work.

Farca was charged by information with (1) manufacturing an assault weapon (§ 30600, subd. (a)); (2) possessing an assault weapon (§ 30605, subd. (a)); (3) interfering with another person's exercise of civil rights by threat of force (§ 422.6, subd. (a)) through his online posts; (4) making a criminal threat against

6

Mahan (§ 422, subd. (a)); (5) threatening Mahan as a public officer (§ 71); and (6) dissuading Mahan as a witness by threat of force (§ 136.1, subd. (c)(1)).

At trial, Farca called as witnesses his mother and a clinical psychologist, who both testified that Farca was autistic. The psychologist explained that autistic people commonly have verbal outbursts and difficulty regulating their emotions. She believed Farca's threat to Mahan would be an example of this. She questioned whether Farca would understand the impact his online postings would have on other people.

The jury acquitted Farca of the charge of dissuading a witness but convicted him of the other charges. The trial court sentenced Farca to the low term of four years on count 1, manufacturing an assault weapon. The court imposed two years for count 2, possession of an assault weapon, stayed pursuant to section 654. The court imposed one year in county jail on count 3, interfering with another person's exercise of civil rights by threat of force, consecutive to the prison sentence and to be served first. The trial court explained that it was doing this as an act of leniency, since if it could not impose the county jail sentence consecutively it would have imposed the middle term on count 1, which would have been six years. (§ 30600, subd. (a).) On count 4, the criminal threat against Mahan, the trial court imposed a consecutive eight months. The trial court imposed two years for count 5, threatening Mahan as a public officer, but stayed it under section 654. Farca's total sentence was therefore one year in county jail, followed by four years and eight months in state

7

prison.  Farca earned 579 days of actual credit and an equal number of good behavior credits, for a total of 1,158 credits, which meant that he had effectively already completed the county jail term at the time of sentencing.

## DISCUSSION

### I.    Constitutionality of sections 30600 and 30605

Farca first argues that sections 30600 and 30605, the statutes prohibiting the manufacture and possession of assault weapons, are unconstitutional because they infringe on the right under the Second Amendment to possess arms for self-defense. Farca calls this a facial challenge to sections 30600 and 30605. Farca principally relies on *New York State Rifle & Pistol Assn, Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*).  *Bruen* "reiterate[d]" its prior holdings in *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*) and *McDonald v. Chicago* (2010) 561 U.S. 742 that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." (*Id.* at pp. 8, 20–24.)  In its analysis of whether the Second Amendment's plain text covered the gun regulation at issue in *Bruen*, the Supreme Court first noted that the two individual plaintiffs were part of " 'the people' whom the Second Amendment protects" and the firearms at issue, handguns, were "weapons 'in common use' today for self-defense." (*Id.* at p. 31–32.)  The Supreme Court then found it was properly undisputed that the plain text of the Second

8

Amendment's guarantee of the right to "keep and bear Arms" (U.S. Const., 2nd Amend.) protected the plaintiffs' proposed conduct of publicly carrying handguns for self-defense. (*Bruen*, at p. 32.)

*Bruen*'s reference to weapons in "common use" came from *Heller*, *supra,* 554 U.S. at pp. 626–627, where the Court affirmed that the Second Amendment right is not a right to carry any weapon whatsoever, and, as the Court had held in *United States v. Miller* (1939) 307 U.S. 174, 179, only protects the sorts of weapons "in common use at the time" the Second Amendment was adopted. *Heller* found this limitation on the right to keep and bear arms was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " (*Heller*, at p. 627.) *Miller* had held that the Second Amendment did not protect a shotgun with a barrel less than 18 inches long. (*Miller*, at p. 178.) *Heller*, at page 627, likewise accepted that "weapons that are most useful in military service — M-16 rifles and the like — may be banned."

Farca implicitly admits that he failed to raise this argument in the trial court, arguing that facial challenges may be raised for the first time on appeal. However, the case he cites for this proposition, *In re Sheena K.* (2007) 40 Cal.4th 875, is more nuanced on this point than Farca acknowledges. Read properly, and as applied to the context of Farca's Second Amendment challenge, *In re Sheena K.* requires us to conclude that Farca forfeited his Second Amendment challenge by failing to raise it below.

9

In *In re Sheena K.*, *supra*, 40 Cal.4th at page 878, the defendant did not challenge in the trial court a probation condition that she not associate with anyone disapproved of by the probation officer. The defendant then argued on appeal that the condition was unconstitutionally vague and overbroad because it did not specify that she know which persons were disapproved of by the probation officer. (*Id.* at p. 880.) *In re Sheena K.* began from the principle that generally a constitutional right, like any other right, will be forfeited by failing to raise it in the trial court. (*Id.* at pp. 880–881.) This forfeiture rule properly applies to appellate claims involving discretionary sentencing choices or unreasonable probation conditions, since "characteristically the trial court is in a considerably better position than the Court of Appeal to review and modify a sentence option or probation condition that is premised upon the facts and circumstances of the individual case." (*Id.* at p. 885.) By contrast, a facial challenge that a probation condition is unconstitutionally vague or overbroad, such as the one in *In re Sheena K.* that the condition lacked a knowledge requirement, "does not require scrutiny of individual facts and circumstances but instead requires the review of abstract and generalized legal concepts — a task that is well suited to the role of an appellate court." (*Id.* at p. 885; accord, *id.* at p. 887.) *In re Sheena K.* cautioned that the forfeiture rule will still apply when constitutional challenges to probation conditions do not raise pure questions of law. (*Id.* at p. 889.)

Even if we accept that Farca's challenge to sections 30600 and 30605 is a facial one, it is not the type of facial constitutional challenge that *In re Sheena K.* permits to be raised for the first time on appeal. The first step in the analysis under *Heller* and *Bruen* requires us to determine whether the weapon Farca manufactured and possessed is "in common use" or is "dangerous and unusual." (*Bruen*, *supra*, 597 U.S. at pp. 24, 32; *Heller*, *supra*, 554 U.S. at p. 627.) The second step looks for relevantly similar historical analogues to the statutes at issue. (*Bruen*, at pp. 24, 28–29.) *Bruen* noted that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" when looking for relevantly similar historical analogues. (*Id.* at p. 27.) These inquiries require the development of a record that is entirely missing in this case.

Farca's own briefing reveals the problem. He cites government reports and survey results that are purportedly replete with facts about the number of rifles manufactured in the last decade (but not the numbers of assault weapons), the number of AR-15 owners, the number of AR-15 users who say they acquired their weapon for self-defense, how often guns are needed or used defensively, and how many homicides are committed with rifles. He asserts that AR-15 rifles are as common as Ford F-series pickups (without citing supporting evidence for the assertion). He cites media reports about specific incidents in which AR-15 rifles were used defensively. He also cites law review articles and reference works about the history of

11

gun manufacture and regulation in the country. Farca has to cite to such sources for these assertions because none of the relevant facts are in the record.

Farca admits that his argument largely tracks the federal district court decision in *Miller v. Bonta* (S.D.Cal. 2023) 699 F.Supp.3d 956, 1011, which held that sections 30600 and 30605 are unconstitutional. However, that case, and another disagreeing with it, illustrate how important it is to create a record on the questions at issue. *Miller* reached its conclusion after delving into the minutiae of an extensive evidentiary record concerning the history of gun use and regulation, including at least nine expert reports. (*Id.* at pp. 978–1010.) More recently, *Rupp v. Bonta* (C.D.Cal. 2024) 723 F.Supp.3d 837 held that sections 30600 and 30605 are not facially unconstitutional. That district court also considered a considerable body of evidence, including at least ten expert reports about how common and dangerous assault weapons are and a compendium of over 1100 pages of historical laws. (*Id.* at 844, 851–881.) *Rupp* considered the same issues as *Miller*, including reports from some of the same experts, and reached diverging conclusions. (See *Rupp*, at 857 & fn. 16, 862, 872–873, 879, 880.) We would not necessarily expect Farca to provide the same level of detail in a trial court constitutional challenge to sections 30600 and 30605 in a criminal proceeding, but these cases do demonstrate the necessity of a robust factual record for a proper *Heller*/*Bruen* inquiry. We can hardly take sides on these constitutional issues based on the smattering of news articles and survey results that Farca cites.

Because Farca's challenge requires the development and assessment of a factual record relating to both the gun at issue and relevant historical analogues, he needed to raise it first in the trial court. As an appellate court, absent exceptional circumstances, we consider only evidence in the record. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered' "].) Also, as *In re Sheena K.*, *supra*, 40 Cal.4th at page 885, indicated, the trial courts are better suited institutionally for addressing factual disputes, such as the *Heller/Bruen* inquiry into the prevalence or dangerousness of weapons. Only when an inquiry turns on the review of abstract and generalized legal concepts for which appellate courts are well suited will an appellate court permit a litigant to raise a constitutional challenge on appeal for the first time. (See *ibid.*) That is not the case here.

Farca's failure to raise this challenge below and facilitate the creation of a record to support it is particularly noteworthy considering that he is swimming against the tide of case law on this issue. After *Heller* but before *Bruen*, *People v. Zondorak* (2013) 220 Cal.App.4th 829, 836 and *People v. James* (2009) 174 Cal.App.4th 662, 676–677 both held that assault weapons are dangerous and unusual weapons that are not in common use for lawful purposes. After *Bruen*, *People v. Bocanegra* (2023) 90 Cal.App.5th 1236, 1256–1257 rejected a Second Amendment challenge to the prohibition of possession of assault weapons in

13

what is now section 30605 and affirmed the holdings in *James* and *Zondorak*. Farca contends that *Bocanegra* and (presumably) *James* and *Zondorak* were wrongly decided because their conclusions lack factual support. However, he did not make a record to support this argument.[2]

We recognize that *Bruen* was decided after Farca was sentenced. However, as relevant here, *Bruen* did not endorse a new standard; it merely "reiterate[d]" *Heller*'s standard, as Farca recognizes when he writes, "[a]s *Heller* instructs, we look to what weapons law-abiding citizens have chosen to defend themselves, that is, what weapons are currently in common use for lawful purposes." (*Bruen*, *supra*, 597 U.S. at p. 24; accord, *id.* at p. 26 [referring to the "test that we set forth in *Heller* and apply today"].) And *Heller* itself reaffirmed the Court's holding in *United States v. Miller*, *supra*, 307 U.S. at page 179, that the government can prohibit the possession of dangerous and unusual weapons not in common use. (*Heller*, 554 U.S. at p. 627.) The relevant law has remained the same since long before Farca's trial. Accordingly, by waiting to raise his Second Amendment challenge until this appeal, Farca has forfeited it.

---

[2] *Rupp v. Bonta*, *supra*, 723 F.Supp.3d at 849–850, placed the burden of proving that a weapon is protected by the Second Amendment on the party claiming the law was unconstitutional, which would be Farca here. By contrast, *Miller v. Bonta*, *supra*, 699 F.Supp.3d at page 1007, placed the burden on the government to justify prohibiting any firearm. The burden of proof is irrelevant to this case. Even if the government has the burden of proof, Farca still forfeited his argument by failing to raise it in the trial court and thereby give the prosecution the opportunity to build the record on the issue.

## II. Interference with civil rights by threat

Section 422.6, subdivision (a) states, "No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate, interfere with, oppress, or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States in whole or in part because of one or more of the actual or perceived characteristics of the victim listed in subdivision (a) of Section 422.55." The characteristics listed in section 422.55, subdivision (a) include gender, nationality, race or ethnicity, and religion. Section 422.6, subdivision (c) limits subdivision (a) by stating that "no person may be convicted of violating subdivision (a) based upon speech alone, except upon a showing that the speech itself threatened violence against a specific person or group of persons and that the defendant had the apparent ability to carry out the threat." A violation of section 422.6, subdivision (a) is punishable by up to one year in jail. (§ 422.6, subd. (c).)

Our Supreme Court in *In re M.S.* (1995) 10 Cal.4th 698, 711, rejected an argument that section 422.6 was not sufficiently specific as to the persons threatened and therefore unconstitutionally vague. The court interpreted the phrase " 'group of persons' " in section 422.6, subdivision (c) "to mean a specific group of individuals, not abstract groups or protected classes." (*In re M.S.*, at p. 711.) The Supreme Court explained, "Reading the statute as a whole, we are persuaded the

15

Legislature meant to proscribe 'true threats' as traditionally understood, not what might be termed 'group libel.' So read, section 422.6 is neither overbroad nor vague in this respect." (*Ibid.*) Consistent with this decision, the pattern jury instruction for section 422.6, which the trial court delivered, requires the prosecution to prove that a defendant threatened physical violence against "a specific group of people." (CALCRIM No. 1351.)

Based on *In re M.S.*, Farca contends there is insufficient evidence that he threatened a specific group of people. To assess the sufficiency of evidence for a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict — i.e., evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] ' . . . We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

16

Even recognizing the lenient standard of review, we agree with Farca that the record does not support his conviction. Farca's Steam posts contained vile anti-Semitic rhetoric and statements about using his assault weapon to kill like 30 kikes" or "over 30 subhumans." However, Farca did not threaten violence against any specific individuals or group of Jewish people, so his statements do not satisfy the "group of persons" victim element of the offense as our Supreme Court interpreted it in *In re M.S.*.

The Attorney General contends that Farca's Steam posts were more than simply group libel of an abstract group or protected class because he targeted Jewish people worshipping in a synagogue. The Attorney General points to evidence that Farca's Steam profile and posts expressed support for Earnest and talked about killing over 30 "high value targets" at a synagogue.

Reviewing the evidence in the light most favorable to the prosecution, a reasonable jury could have reasonably construed Farca's statements as expressing a desire to kill only "high value" Jews in a synagogue. But narrowing the threat from Jewish people generally to Jewish people worshipping in a synagogue, without more, does not meaningfully define a "*specific* group of individuals." (*In re M.S.*, *supra*, 10 Cal.4th at p. 711, italics added.) Farca did not identify any individual Jewish worshippers, any specific synagogue, or even a town, county, or state whose synagogue or synagogues he intended to target. Nor did he explain what would make any Jewish person a "high

17

value" target. Farca's reference to unidentified "high value" Jewish worshippers in synagogues worldwide does not satisfy "specific person or group of persons" requirement in section 422.6, subdivision (c). If the undefined category of "high value" Jews in synagogues were sufficient to satisfy that requirement, the requirement would be meaningless, as would the Supreme Court's distinction between specific groups of individuals and abstract groups or protected classes.

The Attorney General cites the testimony from Deborah K. that she and members of her congregation in Lafayette felt threatened by Farca's posts because he lived nearby. The People cannot make Farca's words more specific merely by presenting testimony from someone who falls within the protected classes of Jews or worshippers in synagogues. Farca's speech must have "*itself* threatened violence against a specific person or group of persons." (§ 422.6, subd. (c), italics added.) Deborah K. was not specifically threatened in Farca's posts, nor was the synagogue where she worships. Indeed, Deborah K. learned of Farca's posts from a police bulletin and media article only after police arrested him and seized his rifle. It would be anomalous to allow law enforcement to define a specific target for those posts by publicizing them in a certain community, after any danger Farca posed had already been neutralized through his arrest and the confiscation of his weapon.

In any event, it does not appear that Deborah K.'s synagogue or its congregants are within the category of "high value targets" in synagogues to which Farca referred. As noted,

18

nothing in Farca's posts identified Deborah K.'s synagogue or its congregants. Deborah K. herself admitted as much. Nor is there any indication in the record that Deborah K.'s synagogue was noteworthy in any way, or that Farca would consider the people who attended services there to be "high value targets." This is significant because Farca's Steam post said explicitly that he "would need a better target than f,ucking [*sic*] some random synagogue with kikes that aren't really a threat."

Accordingly, notwithstanding the repugnant and disturbing sentiments Farca expressed on his Steam account, his conviction for violating section 422.6, subdivision (a) must be reversed.

## III. Threatening a public officer

Section 71, subdivision (a) states that every person is guilty of a public offense "who, with intent to cause, attempts to cause, or causes, any officer or employee of any public or private educational institution or any public officer or employee to do, or refrain from doing, any act in the performance of his duties, by means of a threat, directly communicated to such person, to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out." "The statutory elements of a violation of section 71 are: ' " '(1) A threat to inflict an unlawful injury upon any person or property; (2) direct communication of the threat to a public officer or employee; (3) the intent to influence the performance of the officer or employee's official duties; and (4) the apparent ability to carry out the threat.' " ' " (*People v. Chaney* (2005) 131 Cal.App.4th 253, 256–257.) For this offense, the trial

19

court instructed the jury with CALCRIM No. 2650, telling the jury that the prosecution had to prove (1) Farca "willingly threatened to kill a police officer"; (2) "he intended that his statement be taken as a threat"; (3) "he knew that the person he threatened was a police officer"; (4) "he had the apparent ability to carry out the threat"; and (5) "the person threatened reasonably feared for his safety."

Farca argues, and the Attorney General concedes, that the trial court's instruction was error because it omitted the element that Farca made the threat with the intent to influence Mahan's performance of his official duties. We agree that the trial court's instruction was inadequate. CALCRIM No. 2650, which the trial court used, is designed to instruct on the elements of the offense of threatening a public official under section 76. Section 76 does not include a requirement that a threat be made with the intent to influence the performance of an officer's official duties. (See § 76, subd. (a).) The trial court therefore should have modified CALCRIM No. 2650 to tell the jury that a guilty verdict required a finding that Farca intended to influence Mahan's performance of his duties.

"The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) Failing to do so "is, indeed, very serious constitutional error because it threatens the right to a jury trial that both the United States and California Constitutions guarantee." (*Ibid.*) "[T]he prejudice from an instruction that omits an element of an offense is assessed under

20

*Chapman* [(1967) 386 U.S. 18]. [Citations.] [¶] In this assessment, we 'conduct a thorough examination of the record. If, at the end of that examination, [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error — for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding — [we] should not find the error harmless.' [Citation.] Conversely, where we conclude 'beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' [Citation.] [¶] 'In assessing prejudice in this context, the question is not whether there is evidence in the record that would support a jury finding of the missing element. Instead, we ask whether we can conclude beyond a reasonable doubt that "the jury verdict would have been the same" had the jury been instructed on the missing element.' [Citation.] 'Our task, then, is to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' " (*People v. Lamb* (2024) 16 Cal.5th 400, 448–449.)

The Attorney General argues the omission of the intent to influence official duties element was harmless here because with a proper instruction the jury would have found Farca intended to cause Mahan to do or refrain from doing something in the performance of his duties. The Attorney General notes that at the time of Farca's threat, Mahan was assisting federal probation

21

authorities with a search of Farca's residence. The threat also occurred in between sessions of the preliminary hearing in this case, at which Mahan testified.

This evidence would have been sufficient to allow the jury to find Farca intended to influence Mahan's performance of his duties, but it is not so strong that we can say beyond a reasonable doubt that the jury would have found the prosecution satisfied that element. Beginning with the preliminary hearing testimony theory, it is significant, as Farca notes, that the jury acquitted him of the charge of dissuading a witness. The elements of that charge were that (1) Farca tried to prevent or discourage Mahan from testifying at the preliminary hearing, (2) Mahan was a witness, (3) Farca knew he was trying to prevent or discourage Mahan from testifying, (4) Farca acted maliciously, and (5) Farca threatened, either directly or indirectly, to use force or violence on Mahan. (§ 136.1, subds. (a)(2), (c)(1); CALCRIM Nos. 2622–2623.) The first and third elements of this offense, which asked the jury whether Farca knowingly tried to prevent or discourage Mahan from testifying, overlap with the Attorney General's theory that Farca attempted to cause Mahan not to perform his duty of testifying. The jury's acquittal on the dissuading a witness count therefore supports a reasonable argument that the jury would have also rejected the same theory on the count of violating section 71. The Attorney General points out that an acquittal of one count must not be deemed an acquittal of another count (§ 954) and the sufficiency of evidence of each count must be assessed independently (*United States v. Powell* (1984)

22

469 U.S. 57, 67). But even if the acquittal on the dissuading a witness count is not deemed to be an actual acquittal on the count of threatening Mahan in the performance of his duties based on the testimony theory, it still raises a genuine question as to whether the jury would have also acquitted him on that theory. This is sufficient for the harmless error inquiry here.

The evidence at trial also " ' "could rationally lead to a contrary finding with respect to the omitted element" ' " (*People v. Lamb*, *supra*, 16 Cal.5th at p. 449) on the theory that Farca intended to influence Mahan's performance of his duties during the federal probation search. Mahan testified that he did not participate in the search and instead stood on the sidewalk down the street from Farca's house until the scene was secured. He briefly walked down the sidewalk and into the home, and then left, seemingly immediately. Mahan was walking towards his car and away from Farca's house when Farca yelled the threat at him. This could suggest that Farca was threatening Mahan in retaliation for Mahan's participation in the search, rather than to influence Mahan's involvement in the search. Farca's behavior after his comment supports this view of the evidence. After Farca yelled his comment, the sheriff's deputy asked him to calm down and stop yelling. Farca complied, apologized, and explained that he hated Mahan because Mahan ruined Farca's life. Farca then laid down flat on the ground. The jury could have concluded from this that Farca was angry and wanted to get revenge on Mahan for his involvement in Farca's prosecution, without necessarily intending to influence Mahan in the performance of

23

his duties.  We do not mean to suggest that the jury necessarily had to view the evidence in this fashion, or even that it was more likely than not that it would have done so.  But the evidence could rationally support a finding that Farca did not intend to influence Mahan's performance of his duties, so we cannot say the omission of that element from the jury instruction was harmless as a matter of law.

## IV.    Criminal threat

Section 422, subdivision (a) states, "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . , shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."  Farca contends there is insufficient evidence to support the jury's findings that the threat was unequivocal and unconditional, that Mahan's fear was reasonable, and that Farca had the apparent ability to carry out the threat.[3]  When considering this argument,

---

[3] Farca also directs this argument at the count of threatening a public officer in the performance of duties under

we review the whole record for evidence that is reasonable, credible, and of solid value supporting the verdict, construing the evidence in the light most favorable to the prosecution and not considering credibility or resolving evidentiary conflicts. (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.)

The record contains sufficient evidence of each of the elements of this offense. Nothing in Farca's threat was conditional. Farca contends no officer of Mahan's experience would take seriously the frustrated ramblings of an autistic person sitting on the sidewalk outside his mother's house while police were searching it. This may be Farca's view of the evidence, but we must consider the record in the light most favorable to the prosecution. Mahan testified that he was afraid because Farca called him "Private," indicating that Farca viewed the situation through a military lens and believed Mahan was a legitimate target for violence. Mahan was also concerned because he knew what Farca had posted online about being willing to die by provoking a law enforcement response, which suggested to Mahan that Farca wanted to create a confrontation outside the courthouse. The fact that Farca removed his federal probation ankle monitoring bracelet a few days after making the threat increased the risk from the threat and Farca's ability to carry it out, in Mahan's view.

Farca argues his compliant behavior with the sheriff's deputy after he shouted at Mahan indicates he was frustrated

_____

section 71. Because we conclude the judgment on that count must be reversed for other reasons, we do not discuss it here.

25

and did not intend to make a threat. But Mahan could have reasonably been uncertain how Farca's autism would affect his reactions to the police investigations and could have concluded, based on Farca's online postings advocating for violence, that Farca intended his words seriously. Although the police had seized the assault weapon from Farca, Mahan could not know for certain whether Farca had any other weapons available to him. The physical impossibility of Mahan seeing Farca after Farca murdered him is perhaps indicative of some irrationality on Farca's part, but the jury could nonetheless have concluded from the evidence that Farca intended to threaten Mahan with violence and had the apparent ability to carry out the threat and that Mahan's resulting fear was reasonable.

## DISPOSITION

Farca's conviction on the charges of manufacturing an assault weapon, possessing an assault weapon, and making a criminal threat are affirmed. His convictions on the charges of interfering with a person's exercise of civil rights by threat of force and threatening a public officer to influence the performance of the officer's duties are reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

BROWN, P. J.


I CONCUR:

26

DOUGLAS, J.*

*People v. Farca* (A165339)

---

* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

GOLDMAN, J., Concurring.

I concur in the majority opinion, but as to Farca's conviction for interference with civil rights by threat (§ 422.6, subds. (a), (c)), I would reverse on the ground the majority does not reach; namely, that there is insufficient evidence that Farca had "a specific intent to interfere with a person's right protected under state or federal law." (*In re M.S.* (1995) 10 Cal.4th 698, 713 (*In re M.S.*).) While I do not find unreasonable the majority's conclusion that Farca's posts were insufficiently specific when all the surrounding circumstances are taken into account, I would not adopt as a rule that a threat of violence against a synagogue or other house of worship necessarily lies outside the statute's reach in the absence of additional information about the location of the speaker or the threatened attack.

I. **Specific Intent to Interfere**

In response to Farca's claim that there is insufficient evidence that he specifically intended to interfere with others' civil rights, the Attorney General argues that "[t]he ease with which [Detective] Mahan accessed appellant's profile and posts demonstrates that appellant's threats were made publicly." If recklessness were all that were required under the statute (cf. *Counterman v. Colorado* (2023) 600 U.S. 66, 79–80 (*Counterman*) [adopting recklessness as the minimum mental state required for threats under the First Amendment]), the fact that the posts were publicly accessible in some way would almost certainly suffice. But proof of specific intent requires more. (*People v. Superior Court (Duval)* (1988) 198 Cal.App.3d 1121, 1134.) The

1

FBI provided Detective Mahan with Farca's unique Steam user identification number, and there is nothing in the record demonstrating the "ease" with which Farca's posts could be accessed by someone without it. Farca was engaged in a "chat" with three other users whom he apparently believed to be of like mind; the Attorney General does not dispute that there is no evidence that Farca believed them to be potential targets of the violence he was discussing. One of those people was apparently concerned enough to report Farca to law enforcement, but there is no evidence about the identity of that person or that other users of the Steam platform saw Farca's posts.

The Attorney General's only other argument on this point is that section 422.6, subdivision (a) "imposes no requirement that appellant communicate his threats directly to the group of people he targeted." But to have a specific intent to interfere with others' civil rights, at a minimum one must reasonably have some expectation or understanding that the targets of the threats would see or learn of them. To be sure, the evidentiary bar here is not very high, but it does not appear that the prosecution did anything to try to meet it. On this issue, too, there is no evidence in the record.

For these reasons, I agree that Farca's conviction on this charge should be reversed.

## II.   Specificity of Threats

Farca contends that his threats were not specific because—assuming they can be read to target Jews in a synagogue—they did not identify any synagogue in particular. The Attorney

2

General responds that threatening an attack against Jews worshipping in a synagogue is sufficiently precise in light of the statute's purpose to proscribe "threats of violence motived by prohibited bias and made by a speaker having the apparent ability to carry the threats out." *In re M.S.* endorsed the Court of Appeal's view that "group of persons" in section 422.6, subdivision (c) means "a specific group of individuals, not abstract groups or protected classes" (*In re M.S., supra,* 10 Cal.4th at p. 711), but the Attorney General points out that, by referring to a synagogue, Farca did not simply target a "protected class" as a whole. Neither party has addressed what renders a group "abstract."

*In re M.S.* also construed the statute to reach only " 'true threats,' " which do not receive First Amendment protection. (*In re M.S., supra*, 10 Cal.4th at p. 711.) While the court did not say that section 422.6, subdivision (c) requires no more particularity than necessary to bring a threatening statement within that category, its discussion at least suggests that First Amendment law may be relevant. But there are few cases that have addressed what degree of specificity the First Amendment requires.

The United States Supreme Court has written that true threats "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (*Virginia v. Black* (2003) 538 U.S. 343, 359 (*Black*).) But the Court did not discuss what the phrase "particular

3

individual or group of individuals" means, and the Virginia statute at issue itself prohibited cross burning "with 'an intent to intimidate a person or group of persons.' " (*Id.* at p. 347.) The case involved members of the Ku Klux Klan burning a cross on private property with the owner's permission; it was apparently sufficient that the cross was visible from a nearby public road and from neighboring houses. (See *id.* at p. 348; cf. *United States v. Hussaini* (S.D. Fla. Jan. 14, 2022, No. 19-60387-CR) 2022 U.S. Dist. Lexis 7328, at \*25 & fn. 7; *United States v. Dennison* (D. Me., Mar. 21, 2022, No. 2:21-CR-00149-JDL-1) 2022 U.S. Dist. Lexis 49786, at \*5–\*6.)

In its most recent formulation, the Court defined true threats simply as " 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.' " (*Counterman, supra*, 600 U.S. at p. 74 [quoting *Virginia v. Black, supra*, 538 U.S. at p. 359]; see also *People v. Lowery* (2011) 52 Cal.4th 419, 422 (*Lowery*); *United States v. Davitashvili* (3d Cir. 2024) 97 F.4th 104, 113 [observing that "the [Supreme] Court has never held that a threat must be particularized to count as a true threat"].) As *In re M.S.* pointed out, threats of violence differ from other forms of unprotected speech "because they coerce by unlawful conduct, rather than persuade by expression, and thus play no part in the 'marketplace of ideas.' " (*In re M.S., supra*, 10 Cal.4th at p. 714; see *Counterman, supra*, 600 U.S. at p. 81 ["the protected speech near the borderline of true threats . . . is, if anything, further from the First Amendment's central concerns than the chilled speech in

4

*Sullivan*-type[4] cases (*i.e.*, truthful reputation-damaging statements about public officials and figures)"].)  There is no claim here that Farca's posts were " 'political hyperbole' " (*In re M.S.,* at p. 710) or expressions of "jest or frustration" (*Lowery, supra*, 52 Cal.4th at p. 427) that a reasonable person would not take seriously.

A threat's failure to identify a target precisely does not suggest that it is unlikely to be carried out — or that the victims will not be specific individuals.  For someone who seeks to "injure, intimidate, interfere with, oppress, or threaten" members of a religious group "in the free exercise or enjoyment" of their religion (§ 422.6, subd. (a)), a failure to identify the location of the house of worship could be an intentional effort to spread fear more widely.  A threat does not necessarily become innocuous or unimpactful simply because its reach is broad enough that the people described as its targets may find some solace in statistical probabilities.  However they might estimate the odds that the person making the threat would ultimately choose their own congregation for the attack, they could reasonably understand that the threat was directed at *them*.[5]

---

[4] *New York Times Co. v. Sullivan* (1964) 376 U.S. 254.

[5] The majority writes that "it does not appear that Deborah K.'s synagogue or its congregants are within the category of 'high value targets' in synagogues to which Farca referred."  (Maj. opn. *ante*, at p. 18.)  I have some doubt that a reasonable person would regard Farca's unelaborated reference to "high value targets" as a meaningful limiting principle given the context here, and I do not consider Deborah K.'s concern for her congregation unreasonable notwithstanding the absence of

5

For that reason, I do not think a person who takes to social media to threaten an attack against a house of worship necessarily falls outside the scope of section 422.6, subdivision (c) simply by failing to indicate a geographic location. Suppose, for example, that Farca had announced on a widely visited website that he would seek to kill 30 Jews at a synagogue and would choose its location at random. Such a threat, with its express effort to invoke the terror of unpredictability, seems to lie close to the core of what the statute is intended to prevent. Moreover, contextual clues could effectively narrow a threat geographically regardless of what the person says explicitly.

Here, however, there does not appear to be anything purposeful about the vagueness in Farca's posts. The Attorney General has not argued that Farca's reference to "high value targets" supplied meaningful additional specificity, nor that there was any context for the threats beyond what Farca wrote in his posts. Given those considerations, I find the majority opinion to be a reasonable resolution of a close question, but for the reasons discussed above, I would expressly leave open the possibility that, under even slightly different circumstances, a threat could be sufficiently specific under subdivision (c) of section 422.6 notwithstanding the absence of geographical particularity.

---

"any indication in the record that [her] synagogue was noteworthy in any way." (*Id.* at pp. 18–19.) That said, I agree with the majority that the activities of law enforcement in publicizing the threats "in a certain community" cannot be used to "define a specific target" that Farca's posts did not identify either directly or indirectly. (*Id.* at p. 18.)